UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


LORENE YOUNG,

      Plaintiff,

v.                     Case No.  8:06-cv-1350-T-33MAP


CARGILL JUICE NORTH AMERICA,
INC., et al.,

      Defendants.
_____/

### ORDER

    This matter comes before the Court upon consideration of Defendant Cargill Juice North America, Inc.'s Motion for Summary Judgment (Doc. # 98), filed on May 29, 2008; Plaintiff Lorene Young's Motion for Partial Summary Judgment (Doc. # 105), filed on May 30, 2008; and the responses thereto.  For the reasons that follow, Defendant's motion for summary judgment is granted and Plaintiff's motion for partial summary judgment is denied.

## I.  Background

    Plaintiff Lorene Young's claims arise from injuries she allegedly sustained as a result of an ammonia leak at Defendant Cargill Juice North America, Inc.'s Avon Park juice processing plant on December 29, 2001.  (Doc. ## 2 at 2; 98 at

3).   At the time of the accident, Young was employed by
Defendant KC Cromwell, Inc. and was working on assignment at
Cargill.   (Doc.# 2 at 2).   Pursuant to a joint venture with
another company, Cargill had assumed operations at the
existing Avon Park plant in the fall of 2000.  (Doc. # 98 at
4).

Pursuant to the terms of a Services Agreement with
Cargill, Cromwell was providing Cargill with "an adequate
number of [Cromwell] employees to meet Cargill's staffing
needs" in two job classifications: Lead Person/Forklift
Operator and General Laborer.[1]  (Doc. # 98-5 at 7).  Under the
terms of the Services Agreement, Cromwell provides an on-site
Management Team to supervise Cromwell employees while they are
working at Cargill.  (Id.).  The Management Team's
responsibilities include training Cromwell employees on
Cargill's rules and procedures, monitoring compliance with
those procedures, and ensuring that Cromwell employees "have
the proper safety training." (Id. at 7-8).

The Services Agreement also provides that Cromwell shall
purchase and maintain Worker's Compensation Insurance,

---

[1] Cromwell was formerly known as Citrusforce Staffing,
and the Services Agreement was originally between Cargill and
Citrusforce.  (Doc. # 98 at 5 n. 4).

Employer's Liability Insurance, and Commercial General Liability Insurance. (Id. at 5). Section 8 of the Agreement states:

> Independent Contractor. [Cromwell] shall act at all times as an independent contractor, and nothing contained herein shall be construed to create the relationship of principal and agent, or employer and employee between [Cromwell] and Cargill. [Cromwell] employees assigned to perform the Services for Cargill are solely the employees of [Cromwell].

(Id. at 3).

Young was hired by Cromwell in October 2001 and immediately placed at Cargill in the position of "Lead." (Doc. # 105 at 2). Approximately one month later, Young was promoted to "Supervisor Lead."[2] (Id.). According to Young, Cargill employee Charles Hudson was her direct supervisor at Cargill and was authorized to give Young assignments regarding where in the plant Cromwell employees were to work. (Id.). Hudson was also authorized to tell Young when to take Cromwell

---

[2] According to Young's deposition testimony, as a supervisor lead she "had a say-so over all the teams, as far as making sure everybody was set up with their team, [and] they had the proper amount of people [on] that team." (Doc. # 98-6 at 10). In addition, Young set up the paperwork for safety talks and made sure team members had appropriate safety equipment for their particular job. (Id.). According to Young, safety talks were given at the beginning of each shift and afterward employees were required to sign a sheet documenting that they had attended the talk. (Id.).

employees out of a certain area based on safety concerns and when it was safe to let employees return to that area. (<u>Id.</u>).

Cargill uses anhydrous ammonia as part of its evaporation process to create juice concentrate. (Doc. ## 98 at 4; 105 at 3). On December 29, 2001, an ammonia release occurred, resulting in the evacuation of numerous employees and transportation of approximately thirty-four employees to the hospital for evaluation. (Doc. # 98 at 7-8). Young alleges that she received "personal and psychological injuries" as a result of her exposure to the ammonia. (Doc. # 105 at 3). As a result of these alleged injuries, Young collected workers' compensation benefits for wage replacement and medical expenses. (Doc. ## 98 at 8; 98-5 at 32-33).

Cargill contends that a subsequent investigation revealed that the leak occurred as a result of an unknown individual closing a suction valve on the refrigeration system. (Doc. # 98 at 8). The Occupational Safety and Health Administration (OSHA) inspected the facility following the accident and issued citations to Cargill for serious violations of OSHA regulations. (<u>Id.</u>; Doc. # 98-4 at 2). Cargill alleges that none of the citations from OSHA were related to the relief valve relieving ammonia pressure on December 29, 2001, and that OSHA's report did not indicate how a release could have

4

been prevented if Cargill had followed OSHA regulations. (Doc. # 98-4 at 2).

Young's two-count complaint asserts claims of intentional conduct against both Cargill and Cromwell.[3]   (Doc. # 2). Young alleges that her injuries resulted from Cargill's failure to "properly inspect, maintain, and/or repair its equipment." (Doc. # 2 at 2).   In addition, Young alleges that Cargill knew that its equipment was in need of repair, that other ammonia leaks had occurred because of this faulty or defective equipment, and that another ammonia leak was virtually certain to occur.   (Id. at 2-3).   Young further alleges that Cargill knew its equipment created a dangerous condition, but intentionally chose to disregard the danger and instruct its employees to work in these conditions without warning employees of the danger or implementing appropriate safety measures and training.   (Id.).

Cargill asserts, as one of several affirmative defenses, that Young's claims are barred by the immunity conferred under Section 440.11(2) of Florida's Workers' Compensation Act. Fla. Stat. §§ 440.01-440.60 (2000).   Section 440.11 provides that an employee who receives workers' compensation benefits

---

[3] The claim against Cromwell was dismissed on February 28, 2007.  (Doc. # 29).

5

for a workplace injury may not thereafter file suit against
her employer for damages resulting from those injuries unless
the employer committed an intentional tort which caused the
injury.  Fla. Stat. § 440.11(1).[4]

Cargill seeks summary judgment as to all of Young's
claims, asserting that Cargill is immune from suit because,
(1) it was Young's employer for purposes of workers'
compensation law at the time of the ammonia leak, and (2)
Young cannot assert facts demonstrating that Cargill's actions
constitute an intentional tort.  (Doc. # 98 at 10-24).  Young
argues that statutory immunity is not available to Cargill
because Cargill cannot establish that it exerted the requisite
control over Young to qualify as her employer.  (Doc. # 113 at
1).  In addition, Young asserts that Cargill intentionally
created a situation where death or injury was a substantial
certainty and, therefore, Cargill is not entitled to summary
judgment on the intentional tort issue.  (Id. at 2).

Young seeks summary judgment only as to the issue of

---

[4] The text of Section 440.11 was amended in 2003 to
explicitly exclude from immunity that conduct on the part of
the employer which constitutes an intentional tort.  However,
the Florida Supreme Court has long recognized an intentional
tort exception to worker's compensation immunity.  See Turner
v. PCR, Inc., 754 So. 2d 537, 683-86 (Fla. 2000); Eller v.
Shova, 630 So. 2d 537, 539 (Fla. 1993).

whether Young was, at all times material, an employee of Cargill such that Cargill may be entitled to immunity under Section 440.11(2).  The arguments offered by Young and Cargill on this issue are essentially the same as those asserted in relation to Cargill's summary judgment motion.

## II.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.

1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor.  Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment.  Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856

(11th Cir. 1988)).  However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. Analysis

### A.   Employer Status

Under Florida's Workers' Compensation Act, an employer must pay an employee workers' compensation benefits if the employee suffers an accidental injury arising out of work performed in the course of employment.  Fla. Stat. § 440.09.[5] Generally, an employer's liability is limited to amounts recoverable under the Workers' Compensation Act.  Fla. Stat. § 440.11(1).  This workers' compensation immunity extends to employers that utilize "the services of employees of a help supply services company, as set forth in Standard Industry Code Number 7363" when such employees are acting in furtherance of the employer's business.  Fla. Stat. § 440.11(2); Tu-Lane Invs., Inc. v. Orr, 889 So. 2d 961, 963

---

[5] As the ammonia leak at issue occurred on December 29, 2001, the Florida Workers' Compensation Act in effect on that date governs Young's claims. Thus all citations to Florida's Workers' Compensation Act are to sections in effect on December 29, 2001.

(Fla. 1st DCA 2004).

Standard Industrial Code ("SIC") Number 7363 defines "help supply services" as "[e]stablishments primarily engaged in supplying temporary or continuing help on a contract or fee basis."[6]  According to SIC Number 7363, the temporary help is on the payroll of the supplying company but under the direct or general supervision of the business utilizing the help. The term "help supply services company" is defined to include temporary help services and employee leasing companies.  Tu-Lane, 889 So. 2d at 963; Caramico v. Artcraft Indus., Inc., 727 So. 2d 348, 349 (Fla. 5th DCA 1999).

On May 8, 2008, Young filed a motion to amend her complaint to add new claims for negligence and gross negligence. (Doc. # 90).  United States District Judge James D. Whittemore denied Young's requested amendments as futile, stating that the facts alleged by Young established that Cargill had "'special employer' immunity from suit under Florida's Worker's Compensation Act, Fla. Stat. § 440.11(2)."[7]

---

[6] The 1987 version of the Standard Industrial Code ("SIC") can be accessed on the U.S. Department of Labor, Occupational Safety & Health Administration's website at www.osha.gov.

[7] This case was reassigned to the undersigned on August 5, 2008.

(Doc. # 97 at 1).  Pursuant to the law-of-the-case doctrine, this Court's prior holding that Cargill is entitled to worker's compensation immunity as a special employer must continue to govern this case unless "the initial decision was 'clearly erroneous and would work a manifest injustice.'" Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816-17 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 n. 8 (1983)).  Young has pointed to no evidence to establish that the Court's previous determination was either clearly erroneous or manifestly unjust.

One of Young's primary arguments on this point is that "[i]t is clear from the plain language of the Services Agreement" that Cromwell and Cargill did not intend for Cargill to be the employer of Cromwell employees assigned to work at Cargill's plant.  (Doc. # 105 at 14).  In support of this argument, Young relies on Thornton v. Paktank Florida, Inc., 409 So. 2d 31 (Fla. 2d DCA 1981) as "controlling" case law.   In Thornton, the court found the borrowed servant doctrine inapplicable based on a contract provision stating that the temporary help service's workers were not to be considered employees of the contracting company "for any purpose."   Id. at 33.  However, Thornton has since been overruled by the Florida Supreme Court in Booher v. Pepperidge

11

Farm, Inc., 468 So. 2d 985, 986 (Fla. 1985).  The present rule as established in Booher is that, "The actual employment relationship rather than the subjective intent of the parties should control in any determination of whether a special employee may sue the special employer for work-related injuries."  468 So. 2d at 985.

The record evidence in this case clearly supports a finding that at the time of the accident Young was working in furtherance of Cargill's business as an employee of a help supply services company under contract with Cargill.  Thus, the law of this case stands to the effect that Cargill qualifies as a "special employer" for purposes of workers' compensation immunity.  Young's Motion for Summary Judgment is therefore denied.

**B.    Intentional Tort Exception**

By necessity and design, Florida's workers' compensation system "is based on a mutual renunciation of common-law rights and defenses by employers and employees alike."  Fla. Stat. § 440.015 (2000).  Under this system, an employer accepts vicarious liability for employees' work-related injuries regardless of fault in exchange for immunity from tort liability.  Mullarkey v. Fla. Feed Mills, Inc., 268 So. 2d 363, 366 (Fla. 1972).  The employee gives up his tort

remedies, but is assured of medical compensation without the cost, delay, and uncertainty of litigation.  Id.  The tort immunity afforded employers under the statute is a critical aspect of the workers' compensation system.  See John T. Burnett, The Enigma of Workers' Compensation Immunity: A Call to the Legislature for a Statutorily Defined Intentional Tort Exception, 28 Fla. St. U. L. Rev. 491, 491-492 (2001) (discussing the policies behind workers' compensation immunity and development of the intentional tort exception to such immunity).

However, the Florida Supreme Court has recognized an intentional tort exception to an employer's workers' compensation immunity where an employer engages in an "intentional act designed to result in or that is substantially certain to result in injury or death to the employee." Eller v. Shova, 630 So. 2d 537, 539 (Fla. 1983) (citations omitted).  In the present case, Young seeks to hold Cargill liable for her injuries under this intentional tort exception.  Young does not allege that Cargill acted with deliberate malice to harm Young or other workers and, therefore, the Court confines its analysis to the alternative basis for finding an intentional tort.

Florida applies an objective standard in considering the

"substantially certain" prong of the test.  Turner v. PCR, Inc., 754 So. 2d 683, 691 (Fla. 2000).  Under an objective test, "an analysis of the circumstances in a case [is] required to determine whether a reasonable person would understand that the employer's conduct was 'substantially certain' to result in injury or death to the employee."  Id. at 688.  The employer's actual intent is not controlling under this approach.  Rather, it must be determined whether the employer should have known that its conduct was substantially certain to result in injury or death.  Id.

The Florida Legislature amended the Workers' Compensation Act in 2003 to codify the intentional tort exception to workers' compensation immunity.  See Bakerman v. Bombay Co., Inc., 961 So. 2d 259, 262 n. 3 (Fla. 2007).  The 2003 amendments heighten the intentional tort standard from "substantially certain" to "virtually certain."  Id.; Fla. Stat. § 440.11(1)(b) (2008).  However, because the accident at issue here occurred on December 29, 2001, and the statute does not apply retroactively, pre-2003 workers' compensation law governs this case.  See Bakerman, 961 So. 2d at 262 n. 3; see also Locke v. Suntrust Bank, 484 F.3d 1343, 1350 n. 5 (11th Cir. 2007) (applying the pre-2003 "substantially certain" standard where the incident complained of occurred in 2002).

14

There is no clear test that establishes substantial certainty as a matter of law, however a showing greater than gross negligence is required. Bakerman, 961 So. 2d at 264; Locke, 484 F.3d at 1350. Florida cases finding liability under the intentional tort exception "share a 'common thread of evidence that the employer tried to cover up the danger, affording the employees no means to make a reasonable decision as to their actions.'" Bakerman, 961 So. 2d at 263 (citing Turner, 754 So. 2d at 691). This element involves intentional conduct on the part of the employer to "prevent the employee from learning and appreciating the risks involved in the work [that are] specifically known by the employer." Pendergrass v. R.D. Michaels, Inc. 936 So. 2d 684, 690 (Fla. 4th DCA 2006). Other factors that Florida courts have highlighted in applying the intentional tort exception are the "employers' prior knowledge of earlier incidents and employers' decisions to remove safety mechanisms." Locke, 484 F.3d at 1351.

Cargill argues that the element of intentional concealment is not present here because Cargill had no knowledge of any prior release of dangerous levels of ammonia or that there were any known defects in the refrigeration system that might lead to the type of release that occurred on December 29, 2001. (Doc. # 98 at 14-19). Nor, Cargill

15

contends, is there any evidence that it intentionally concealed any risks related to the potential toxicity of ammonia exposure in the workplace. (Id. at 17-22).

Young asserts that Cargill was aware that ammonia was frequently leaking into certain work areas and having adverse effects on workers, but that Cargill failed to take any corrective action. (Doc. # 113 at 6-8). Further, Young alleges that Cargill intentionally concealed known risks of ammonia exposure by telling Cromwell workers that there was not enough ammonia in the air to make anyone sick. (Id. at 7).

Young has testified in her deposition that several employees complained to her about the ammonia smell and on occasion would request medication for headaches. (Doc. # 104-2 at 27-29). Young has further attested that when she reported ammonia odors to Charles Hudson, her direct supervisor at Cargill, he usually removed Cromwell employees from those areas and would not allow workers to return until the area had been deemed safe. (Id. at 27, 29-43). On one occasion, Young reports that she kept her employees out of an area where ammonia odors were present and Hudson implied there might be negative repercussions to that decision. (Id. at 43). However, Young admits that Cargill never reprimanded her or

16

took any steps to discourage any such actions in the future.
(<u>Id.</u>)

Young has also offered the testimony of Carla Rushing, another Cromwell lead supervisor, which reflects similar reports from several employees regarding intermittent symptoms of ammonia exposure. (Doc. # 106-2 at 22-30). Rushing has asserted that her Cargill supervisor told her that nothing could be done about the ammonia odor but that if she or other workers were feeling any physical effects, they should take a break and get some fresh air. (<u>Id.</u> at 15-17). Young and Rushing have both indicated that Larry Plair, Cargill's Plant Manager, told them on separate occasions that there was no danger to employees from the levels of ammonia that were present in certain work areas. (Doc. ## 104-2 at 36-41; 106-2 at 25, 29-30, 45).

Although this evidence suggests that Cargill may have acted negligently in exposing workers to levels of ammonia that were known to be causing physical symptoms in some individuals, the evidence does not establish that Cargill intentionally withheld "knowledge of a defect or hazard which pose[d] a grave threat of injury" to employees. <u>Connelly v. Arrow Air, Inc.</u>, 568 So. 2d 448, 451 (Fla. 3d DCA 1990) (finding that an employer will be considered to have acted in

17

the belief that injury was certain to occur where it withholds such knowledge from the employee).[8]  Florida Courts rarely find that an employer's conduct rises to the level of an intentional tort, even "in the face of sometimes egregious acts by employers and managers." Woodson v. Ivey, 917 So. 2d 993, 996 (Fla. 5th DCA 2005) (citing Byers v. Ritz, 890 So. 2d 343, 347 (Fla. 3d DCA 2004)).  A strong probability of injury is not sufficient to overcome workers' compensation immunity. Timones v. Excel Indus. of Fla., 631 So. 2d 331, 332 (Fla. 1st DCA 1994).

Turner v. PCR, Inc. is illustrative of the type of conduct that supports a finding of an intentional tort.  In Turner, the employer, PCR, was developing a replacement coolant for Freon using a highly reactive compound that was subject to explosions.  754 So. 2d at 684-85.  Even after PCR was notified that the compound was being taken off the market because of its explosive qualities, PCR continued to use it and did not inform its employees of this danger.  Id. at 685.  In addition, the employer knew of several previous explosions at the plant, some involving this same compound.  Applying the objective test, the Florida Supreme Court found that there was

---

[8]This holding in Connelly was cited with approval by the Florida Supreme Court in Turner.  754 So. 2d at 690.

sufficient evidence to present material issues of fact that a reasonable employer in these circumstances would know that its intentional conduct was substantially certain to result in injury or death.  Id. at 691.

Unlike Turner, the evidence in this case does not establish prior knowledge or intentional concealment on the part of Cargill.  First, the record does not show that Cargill possessed knowledge that employees were being placed at risk for serious injury or death.  Although the record shows that Cargill employees were aware that some level of ammonia leakage was occurring, the testimony shows that Cargill had no knowledge of the source of the leaks or the concentration of ammonia that was present in the work areas.

The testimony of Young and Rushing suggests that several Cromwell employees suffered intermittent physical symptoms due to some level of ammonia exposure.  However, the Court does not find that, based on the symptoms reported by these employees, Cargill should have known that serious injury or death was substantially certain to occur.  To the contrary, there is no evidence that any employee suffered more than transient physical effects from their exposure to the apparently small amounts ammonia present in certain work areas.  Furthermore, Cargill has offered expert testimony to

19

the effect that "a number of microscopic leaks are to be expected in a juice processing system," that an ammonia odor can be detected well before the ammonia level "becomes noxious to the worker," and that individuals have varying sensitivities to ammonia exposure. (Doc. # 98-8 at 2-3).

Importantly, Young has not shown that Cargill had any knowledge that a release of the type or magnitude that occurred on December 29, 2001, was likely to occur. Cargill representatives have testified that the accident in question occurred when a relief valve released a build up of ammonia caused by the improper closure of a suction valve by an unknown individual, and Young has offered no evidence to rebut this contention. (Doc. ## 102 at 16; 103 at 12-13). Assuming that Cargill's assertion is true, Young has not shown that Cargill had prior knowledge of circumstances that might make such an accident likely to happen. The record contains no evidence of a prior problem with either the suction valves or the relief valves on the refrigeration system. Young has not even alleged that the relief valves malfunctioned at the time of the release. There also were no previous releases from the relief valves that might have put Cargill on notice of the possibility of such a release.

Further, unlike the circumstances in Turner, Young has

20

not established that Cargill intentionally concealed a known risk of a large release of ammonia at the plant.  Although Plair sometimes told Young and Rushing that a little amount of ammonia would not hurt anyone, there is no evidence that Plair intentionally concealed the presence of known toxic levels of ammonia in work areas or his knowledge that serious injury would occur if workers were placed in those areas.  In fact, both Young and Rushing have testified that Plair himself would often work in the areas that Cromwell employees were refusing to work in due to the ammonia odor.  (Doc. ## 104-2 at 29-30, 35-37; 106-2 at 25-26).  Also, Young has testified that, on most occasions, both Hudson and Plair removed workers from areas with ammonia odors and did not let the workers return until the areas were deemed safe.  (Doc. # 104-2 at 29, 34-35, 44).

Young asserts that Cargill's failure to properly train its employees contributed to the ammonia release that caused Young's injuries.  However, in her deposition, Young stated that "Cargill's representatives, including [Larry Hadden, Cargill's Environmental and Safety Manager, and Mike Loudermilk, Cargill's Safety/Refrigeration Supervisor], were well trained in the use and handling of ammonia . . . ." (Doc. # 113 at 20).  Young has also testified that she was

21

aware of the risks associated with ammonia exposure, that she gave safety talks to employees that included the topic of ammonia, and that she knew to remove her employees when she detected a strong odor of ammonia. (Doc. # 104-2 at 43-44, 51). Thus, Young has not shown that Cargill's actions prevented Young from making an informed decision regarding the risks of working in a facility that uses anhydrous ammonia as part of its refrigeration process.

In Pendergrass v. R.D. Michaels, Inc., the court considered plaintiff's allegations that defendant's lack of safety training contributed to plaintiff's fatal injuries. 936 So. 2d 684. The plaintiff in Pendergrass was killed when a wall that he was constructing collapsed due to the defendants' failure to brace the wall. Id. at 686. The defendants did not have a safety program in place, but instructed workers to use their common sense and to be careful. Id. at 687. Pendergrass's estate alleged that the defendants committed an intentional tort because, among other things, they failed to provide a safety program and failed to instruct Pendergrass in safety precautions and recognition of dangers. Id. at 687.

The Pendergrass court, in addressing the training issue, found that at most the lack of training was an act of

negligence, not an intentional tort, because Pendergrass was not using machinery that required special training and it should seem "fairly obvious" that walls and bricks might fall during construction of walls. Id. at 692. Similarly, Young was not working with specialized equipment at Cargill and the evidence shows that she was aware that a release of ammonia requiring evacuation might occur. (Doc. # 104-2 at 59-61). Thus, as in Pendergrass, Cargill's failure to have an official training program in place regarding ammonia does not establish that its conduct rises to the level of an intentional tort.

Young also asserts that Cargill should have known that the accident was substantially certain to occur because Cargill's plant was not up to code and that it failed to follow known safety protocol. (Doc. # 113 at 3-6). In support of this contention, Cargill points to OSHA violations that Cargill received after the December 29, 2001, accident. (Id. at 5-6). The OSHA citations, which were classified as "serious," related to Cargill's failure to follow certain safety and training procedures. (Doc. ## 98 at 8-9; 102 at 28-34; 113 at 5-6).

The defendants in Pendergrass were similarly cited for OSHA violations. Unlike here, however, the Pendergrass violations were directly related to the accident that caused

23

Pendergrass's injuries. 936 So. 2d at 686-687. Even so, the court there held that the OSHA violations did not change the outcome of the case or create a material issue of fact on the intentional tort issue. Id. at 693. The court reasoned that "a serious violation would not of itself constitute an intentional tort, because it only requires a substantial probability, not certainty, of injury or death." Id. In light of the holding in Pendergrass, the Court is not persuaded that the OSHA violations in this case, which were not even directly related to the cause of the December 29, 2001, accident, would lead a reasonable jury to find that the subject accident was substantially certain to occur.

Finally, Young asserts that the "totality of the circumstances" establishes that Cargill's intentional conduct was substantially certain to result in injury or death. (Doc. # 113 at 19-20). Citing to several cases that reject the "'cumulative approach' to ascertaining whether injury was a substantial certainty," Cargill argues that Young cannot "add together small risks of injury in order to reach a combined total where the likelihood of injury to some employee sometime is likely to happen." (Doc. # 98 at 22-24) (citing Allstates Fireproofing, Inc. v. Garcia, 876 So. 2d 1222, 1226 (Fla. 4th DCA 2004) (internal citations omitted); Feraci v. Grundy

24

Marine Constr. Co., 315 F. Supp. 2d 1197, 1211 (N.D. Fla. 2004)).

The Court agrees. In Feraci v. Grundy Marine Construction, Co., plaintiff sought to establish that defendant was liable for injuries he sustained while working at a construction site, based on allegations of twenty-two "grossly negligent" acts or omissions by defendant which evidenced a "willful and wanton disregard for [plaintiff's] safety." 315 F. Supp. 2d at 1202-03. Plaintiff argued that "the composite of circumstances" showed that injury or death to plaintiff was substantially certain to occur. Id. at 1211. Applying Florida law, the district court rejected this position, stating that even if the twenty-two grossly negligent acts or omissions had occurred, Plaintiff could not "lump them together to demonstrate substantial certainty." Id. Likewise, Young cannot add together each of Cargill's negligent actions to assert that, in the aggregate, they establish that an intentional tort was committed.

Under the circumstances of this case, Young has not established a genuine issue as to any material fact that might lead a jury to find that a reasonable employee in Cargill's position should have known that injury or death to Young was substantially certain to occur. Thus, the Court finds that

25

Cargill is not subject to liability under the intentional tort exception to workers' compensation immunity. Cargill's motion for summary judgment is therefore due to be granted.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiff Lorene Young's Motion for Partial Summary Judgment (Doc. # 105) is **DENIED**.

(2) Defendant Cargill Juice North America, Inc.'s Motion for Summary Judgment (Doc. # 98) is **GRANTED**.

(3) The Clerk is directed to enter judgment in favor of Defendant Cargill Juice North America, Inc., terminate any pending motions, and close the file.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>15th</u> day of December 2008.


_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


Copies:

All Counsel of Record


26